**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**
                    **Plaintiff,**

*vs.*

**THOMAS ALLEN HADDIX,**                    **CRIMINAL ACTION NO. 2:05CR19-6**
                    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On the 13th day of September, 2005, came the defendant, Thomas Allen Haddix, in person and through counsel Richard W. Shryock, Jr. and also came the United States by its Assistant United States Attorney, Stephen Warner, for a hearing on Defendant's Motion to Suppress [Docket Entry 54].

The undersigned received the testimony of West Virginia State Trooper Mark Cunningham; West Virginia State Trooper Christopher Snodgrass; received exhibits in evidence; and heard arguments of counsel.

### Procedural History

Defendant Haddix was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on June 22, 2005. The indictment charges him with Conspiracy to Manufacture and to Distribute Methamphetamine, Manufacture of Methamphetamine, and Attempt to Steal Anhydrous Ammonia. [Docket Entry 2]. An arrest warrant was issued on June 22, 2005, by United States District Judge Robert E. Maxwell and Defendant appeared before United States Magistrate Judge John S. Kaull on July 29, 2005.

### Facts

The undersigned finds the following testimony and evidence credible, and therefore recommends these findings of fact.

On May 14, 2004, the Barbour County 911 received a call from a female claiming that someone was shooting at her. The call was placed on a cell phone and the reception was not good- the call kept "breaking up." West Virginia State Trooper Mark Cunningham responded to the call. He testified the directions to the location he was given were "horrible." He "went up the wrong hollow." He walked up the hollow, over a hill, and still did not see anything. He heard voices and followed them, having to "hike[] through the woods" before finally coming upon the defendant and a female in the woods. The location was in the woods, not in a town. There were some houses around the area, but at "quite a distance" from where the officer located the couple. He testified he had never been to the area before, and "actually had no idea where [he] was at." He was aware of information regarding a suspected meth lab in the Boulder area of Barbour County, but did not know he was in that area. He "was lost" and "didn't have a clue."

Tpr. Cunningham approached the couple and asked about the 911 call. Defendant told him he had fired a gun, but not at anyone. Tpr. Cunningham asked Defendant for the location of any gun, and Defendant told him the gun was under a trailer, either under or behind a piece of tin. Defendant told the officer he could "go down" and retrieve the gun. He also said the gun was not loaded, and there was no one in the trailer. He told the officer he "could check." Tpr. Cunningham could see a small camper trailer ("the kind you'd pull") about 70 yards away. He did not think he could see the entire camper from the ground up, because it was down a bank, but he could see at least the top of it. He was concerned there may have been someone else there who could get the gun, and he wanted to get control of the gun. He felt he was not in the best situation, because he was proceeding from up on a point, and had to walk down to the camper through a cleared area where he could be observed from the lower camper.

Tpr. Cunningham proceeded down to the trailer and opened the door to make sure "on a brief quick look that no one was in there." He then looked under the camper for the gun, but did not find it. He returned back up to Defendant, who then told him more precisely where the gun was located. Tpr. Cunningham again went down to the camper, again looked inside to check if anyone was inside, and then looked under the camper and under a piece of tin, where he did find a gun.

Tpr. Cunningham testified he had previous information about a meth lab in the general area. While down at the camper he saw items around that led him to believe there might be a meth lab there. As he was looking in the camper he saw burn marks "all above the stove," a "heat burn" on the wall, and rock salt. He testified that was not unusual in a camper, however. He testified that meth labs were new in the area and he had not yet had any training or experience in identifying or investigating a meth lab. He had heard, though, about meth labs and "cooking" and "fires" and "explosions– that sort of thing," but really did not know what was in there. He did not seize anything.

As he was "down in that area" Tpr. Cunningham saw a big propane cylinder tank "over the bank." It was partially covered with some leaves. The large size of the tank and the manner in which it was "laid in the bank" and covered with leaves, led him to believe someone had attempted to disguise it. Usually propane tanks for campers are much smaller and up next to the camper. Tpr. Cunningham "then started kind of a perimeter search around to make sure what was around." He testified: "[A]s I was walking through the woods over the bank just from the edge of the trailer out, as I stepped I heard a ticking noise and stopped." He could see something blue under a "teepee of rocks." He was afraid something was "winding up to detonate," or he had stepped on something that would detonate. He called up to other officers on the hill, who recommended he get behind a big

tree that was right behind him. He got behind the tree, and when nothing further happened "retreated back up over the bank." He had had no information regarding booby traps or explosives in the area of the suspected meth lab.

The officers discussed whether to call the State Trooper Bureau of Criminal Investigations ("BCI"), or the bomb squad. They decided to call BCI to ask what, if anything, could be in a meth lab that would cause a ticking noise and be in that type of position. The officers staged "back up near where" Defendant and the female where sitting on stumps. They did not discover or seize any evidence.

When Tpr. Cunningham spoke with Defendant, he was not Mirandized, nor was he handcuffed. Defendant was later arrested, but not by Tpr. Cunningham. He had no idea what agency arrested him or what the charges were.

Tpr. Snodgrass was called because he had experience in meth labs and may have known what the ticking noise was. Tpr. Snodgrass arrived on the scene aware it was the site of a possible meth lab. He discussed with the officers already on the scene their reports of a ticking noise "coming from an area in the woods." He went down to the area "several hundred feet away." He described the location of the camper and the source of the ticking noise as follows:

> When you came up to the trailer the way we came in, you would have been coming up to the rear side of the camper. There were rocks located about 25-30 yards or more down over the bank from the front side of the camper trailer.

The bank went down from the camper, and the rocks were like an "embankment of fieldstone." In and around the camper there was not an area like a "front yard," but it was cleared of brush. From the front door of the camper he could not see the source of the ticking noise (later identified as a blue backpack.) When he approached the area identified by Tpr Cunningham, he saw a mason jar sitting

by itself on the rocks above a blue backpack under the rocks. He heard the ticking sound coming from the backpack. He opened the backpack and found two bottles of liquid. He took two samples from the bottles in the backpack and two samples from the mason jar up on the rocks.

Tpr. Snodgrass then entered the camper and took a sample of a white powder. He did not believe he seized any other evidence or took any other samples.

Prior to the above date, Tpr. Snodgrass had entered onto the same property without a warrant. On that occasion he believed he had discovered the precursors of a meth lab. He approached the Prosecuting Attorney about getting a search warrant, but did not get one on that occasion. He had gone to the County Clerk's office and determined the property belonged to a "Saffold." Looking where the camper was located, he believed it was on "Saffold property." Upon cross examination he testified it was possible the property could have been owned by "Peggy Haddix," however.

### Contentions of the Parties

Defendant argues:

1)      No exigent circumstances existed which would justify the warrantless search of the camper;

2)      The search for a gun was merely a pretext for searching for a meth lab; and

3)      The plain view doctrine does not apply because none of the officers were legitimately in a position to view any objects inside the camper and "many, if not all of the items seized either in the camper or outside of it were of such a character that it was not immediately apparent that they were contraband."

The Government's Response to the Motion to Suppress is sparse, and the Court therefore includes it in its entirety as follows:

1. The defendant correctly identified that a backpack and a camper were searched near the Boulder area of Barbour County, West Virginia, on or about May 14, 2004, and the police were at the scene in response to a domestic situation involving shots fired.

2. There was no search warrant.

3. The backpack was hidden in the woods under some rocks. While at the scene in response to the domestic, officers heard a "ticking' noise, which alerted them of the backpack from where the noise was coming from [sic]. They also noticed, outside the camper, electrical wiring coming from the camper, a propane tanks [sic], a mason jar with liquid, Liquid Fire drain cleaner, a "burn" trash barrel outside with Starter Fluid, or ether, cans. These items were all outside the camper and outside the backpack. In May of 2004, meth labs were new to law enforcement in the Barbour County area and known to be dangerous. Add the "ticking" noise, and the United States argues, there was an imminent issue of safety and destruction of evidence.

4. As it would turn out, the "ticking" noise was from a fish aerator.

5. Importantly, the mason jar with clear liquid, from which samples #1 and #2 were taken, was determined by a State Police Chemist at the WVSP Forensic Lab to contain a detectable amount of methamphetamine. This mason jar, as mentioned, was located outside the trailer and outside the backpack "above the [ticking] backpack".

<u>**Discussion**</u>

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." <u>United States v. Wilhelm</u>, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of

the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

The undersigned notes that neither party raised the issue of whether the camper trailer should be considered a "home" at all. There was no testimony or evidence regarding whether it appeared Defendant actually lived there and the Government did not argue that the camper was not Defendant's home or residence. The undersigned therefore assumes without knowing, that the camper should be considered a "home." Another threshold issue is that of standing. Only at the hearing did the Government raise the issue that Defendant may not have standing to contest the search. The Court therefore gave the Government additional time to submit any evidence or argument it had regarding lack of standing. The date given the Government to submit such evidence or argument, if any, has passed, and no supplements were filed. The undersigned therefore assumes the Government is not arguing lack of standing. Nor does the Court have any information or evidence that Defendant lacked standing.

The Government does argue that Tpr. Cunningham was at the scene for a legitimate purpose – that is, to investigate the 911 call from a female who called to report someone was shooting at her. Defendant argues that Defendant's girlfriend told the officer that she was not a victim, and it was all a misunderstanding. Tpr. Cunningham testified, however, that both Defendant and his girlfriend were "playing down" the shooting incident. Defendant admitted firing a gun but said he hadn't fired at anyone. The undersigned finds under the circumstances it was reasonable for Tpr. Cunningham

to further inquire and to try to locate and secure the gun.    There is no evidence Defendant was detained in any way at this time.  Defendant told the officer he could go down and retrieve the gun from under the camper.  He also said there was no one in the trailer, but that the officer "could check."  The undersigned finds Tpr. Cunningham's testimony credible, and therefore finds Defendant did consent to his going down to the camper, looking for and retrieving the gun underneath the camper, and looking inside to check if anyone was in the camper.  The undersigned also finds the consent was knowing and voluntary.  See United States v. Mendenhall, 446 U.S. 544 (1980).  A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement.  Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  The fact that the officer needed to look twice to locate the gun does not affect this conclusion, especially because Defendant advised the officer the second time where to find the gun.  Nor does the officer's looking in the camper to see if anyone else was there affect this conclusion.  Defendant expressly consented to his looking in the camper, and the officer's testimony that he was concerned about someone else being in the trailer or in the area, especially with a gun, is both credible and legitimate.

The scope of a consent search is determined under an objective reasonableness standard, rather than the subjective beliefs of either the defendant or the officer.  Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803-04, 114 L.Ed.2d 297 (1991).  That is, the court must determine what a reasonable person would have understood from the interchange between the officer and the suspect.  Id.    The undersigned believes a reasonable person would have understood Tpr. Cunningham had Defendant's consent to go down to the camper, look underneath the camper for a gun, and look inside the camper for people.

The undersigned also credits Tpr. Cunningham's testimony that he saw heat marks and burn

marks in the camper and saw a large propane tank down over the bank while he was legitimately at the camper pursuant to Defendant's consent. He noticed the propane tank was much larger than normal for a small camper, and was located down over a bank, and not next to the camper. It was partially covered in leaves, as if to be hidden. The undersigned finds this evidence was within plain view of Tpr. Cunningham while he was legitimately outside the camper. "Viewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment." United States v. Jackson, 131 F.3d 1105, 1108 (4th Cir. 1997).

The "touchstone" of Fourth Amendment analysis is whether the individual has a reasonable expectation of privacy in the area searched. Oliver v. United States, 466 U.S. 170, 104 S. Ct. 1735, 80 L.Ed. 2d 214 (1984). The Court in Oliver explained that "the common law distinguished 'open fields' from the 'curtilage,' the land immediately surrounding and associated with the home." Id. at 180, 104 S. Ct. at 1735. The Court further defined curtilage as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" Id. at 180, 104 S.Ct. at 1735. Finally, in United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Court held that curtilage questions should be resolved with particular reference to four factors: 1) the proximity of the area claimed to be curtilage to the home; 2) whether the area is included within an enclosure surrounding the home; 3) the nature of the uses to which the area is put; and 4) the steps taken by the resident to protect the area from observation by people passing by. Id. at 301, 107 S.Ct. 1134. The Court in Dunn cautioned:

> These factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration - - whether the area in question is so intimately tied to the home itself that it should be placed under the home's

umbrella of Fourth Amendment protection.[1]

Id. at 301, 107 S. Ct. 1134 (emphasis added).

Tpr. Cunningham encountered the "ticking backpack" after he had gone "over the bank" away from the camper and was walking "through the woods." Considering the four factors in Dunn, the undersigned finds the evidence was not within the curtilage, if any, of the camper. Instead, it was found in the "open field." First, the undisputed testimony of Trooper Snodgrass was that the mason jar with the clear liquid and the blue backpack were 25 - 30 yards or more down over a bank from the camper. Second, there is no evidence the area was enclosed in any manner – the officers testified to walking down to the camper from the location where they found Defendant and his girlfriend, and again walking away from the camper down a bank and through the woods. Third, although the woods were cleared of underbrush in the area around the camper, there is no evidence the area was used for "the intimate activities of the home." Dunn at 302, 107 S.Ct. at 1134. Finally, there were apparently no steps taken to protect the area from observation by people passing by. Again, the officers testified to simply walking through the woods to and from the camper.

Considering all the Dunn factors, the undersigned finds the area where the mason jar and

---

[1] The undersigned notes the continued express use of the word "home." If being used as an actual "home," there is no doubt there would be a legitimate expectation of privacy in the camper and its curtilage, if any. If only used as a temporary residence, in the normal manner a camper would be used, there would still, in most instances, be an expectation of privacy in the camper itself and its interior, but there is a question of whether there would be any curtilage. See, e.g., United States v. Barajas-Avalos, 377 F.3d 1040 (9th Cir. 2004)(finding a travel trailer used occasionally as a place to sleep while the owner, who had a separate residence, performed farm chores was not being used as a home, and that, therefore, the clearing around it was not protected from trespass by the Fourth Amendment.) As already noted, however, the United States did not raise the issue of whether the camper was actually used as a "home," and the undersigned therefore assumes without knowing that it was used as a home, and therefore may have a curtilage entitled to a reasonable expectation of privacy.

backpack were found was not "so intimately tied to the home itself that is should be placed under the home's umbrella of Fourth Amendment protection." Instead, the items were out in the woods, down a bank, and atop and in a fieldstone embankment. The undersigned notes that, contrary to placing these items within the protection of the intimate area of the home, the owner of the items appears to have instead purposely placed them outside that protection. There is, under such circumstances, no reasonable expectation of privacy.

While unnecessary to this decision, the undersigned agrees with the Government that, once confronted with the mysterious "ticking noise," "exigent circumstances" would permit the warrantless search of the backpack. The undisputed, credible testimony of Tpr. Cunningham was that he feared he had accidentally "tripped" an explosive device.

For all the above reasons, the undersigned finds the evidence seized from outside the camper is admissible. The evidence does not support an exception to the warrant requirement for the search of the interior of the camper, however. Defendant was already under arrest, Tpr. Cunningham had already determined no one was in the camper, and there were numerous officers available to secure the scene while a search warrant was procured. Further, Defendant's consent to look in the camper was for the purpose of checking for people, not evidence of drugs or drug manufacturing. Neither does the Government make any argument for the search of the interior of the camper.

The undersigned therefore finds any evidence seized pursuant to the warrantless search of the interior of the camper is inadmissible.

### **RECOMMENDATION**

For the reasons herein stated, it is **RECOMMENDED** that Defendant's Motion To Suppress [Docket Entry 54], be **DENIED** as to the evidence found outside the camper and **GRANTED** as to

the evidence found inside the camper.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 28 day of September, 2005.

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE